UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| LAUREN JUSTINE PALMER, | ) | CASE NO.  5:08cv125 |
| | ) | |
| Plaintiff, | ) | JUDGE JOHN R. ADAMS |
| | ) | |
| vs. | ) | |
| | ) | |
| REBECCA CACIOPPO, et al., | ) | **MEMORANDUM OF OPINION** |
| | ) | **AND ORDER** |
| Defendants. | ) | [Resolving Docs. 59, 71, 72] |
| | ) | |
| | ) | |

This matter comes before the Court on Defendants' Motion for Summary Judgment (Doc. 59). Also pending before the Court is Plaintiff's Motion to Supplement (Doc. 71) her response to Defendants' Motion for Summary Judgment, and Plaintiff's Motion for Leave (Doc. 72) to file a motion for summary judgment. The Court has been advised, having reviewed the motions and the responses and replies thereto, as well as evidence in support and relevant case law. For the reasons set forth herein, Defendants' Motion for Summary Judgment is GRANTED, Plaintiff's Motion to Supplement is GRANTED, and Plaintiff's Motion for Leave is DENIED AS MOOT.

I.      **Factual and Procedural History**

Lauren Palmer ("Plaintiff"), formerly a secretary in the Akron City School system, has brought suit against Defendants Rebecca Cacioppo[1] ("Ms. Cacioppo"), the principal of Glover Elementary School; Kathy Hooper ("Ms. Hooper"), the coordinator of support staff for the Akron Public Schools; and the Akron Board of Education ("School Board"). She has raised the following claims in her Amended Complaint (Doc. 24):[2]

---

[1] Although the parties have used varied spellings of Ms. Cacioppo's name throughout this litigation, Mrs. Cacioppo herself indicated the spelling used herein. Cacioppo Dep. at 3.

[2] Plaintiff raised some additional claims, including violation of a right to privacy under HIPAA as well as some claims against Defendants in their individual capacity. The Court dismissed these claims in its Memorandum of

1. Quid pro quo sexual harassment under Title VII against each of the three defendants in their official capacities;

2. Sexually hostile work environment under Title VII against each of the three defendants in their official capacities[3];

3. Violation of her Fourth Amendment right to be free from unreasonable searches and seizures, brought against Ms. Hooper in her official and individual capacities under 42 U.S.C. § 1983;

4. Violation of her rights under the Family and Medical Leave Act (FMLA), § 29 U.S.C. 2601, *et seq.*, brought against Ms. Hooper in her official capacity.

Defendants have moved for summary judgment on each of these claims.

Plaintiff worked for the Akron Public School System for thirteen years, with the majority of that employment taking place as a secretary at Glover Elementary School ("Glover").  On July 14, 2006, the Akron Police Department arrested Plaintiff for possession of marijuana.  She pled guilty to a minor misdemeanor drug abuse charge on August 9, 2006.  The court imposed a fine, suspended her license for six months, and required her to write an essay.  On August 14, 2006, approximately two weeks before the new school year started, Plaintiff reported at Glover for work.  During these two weeks Plaintiff and the principal Ms. Cacioppo were the only two people required to be at the school.

At some point in August,[4] when Plaintiff and Ms. Cacioppo were alone at the school, Ms. Cacioppo invited Plaintiff to go to Strickland's with her to get ice cream.  Ms. Cacioppo does not deny this fact.  However, Ms. Cacioppo does dispute the rest of the events as related by Plaintiff, who herself had some trouble remembering the order of the events.  Plaintiff's relation of the facts was, generally, as follows:  After purchasing their ice cream, Plaintiff started to sit down

---

Opinion and Order (Doc. 56) granting Defendants' Motion for Partial Judgment on the Pleadings (Doc. 45).  The claims enumerated herein are all those claims that remain.

[3] Plaintiff brought the quid pro quo sexual harassment claim and the hostile work environment claim together as the same claim.  However, because they are actually separate claims, the Court will address them separately herein.

[4] Neither party remembered the exact date and could only narrow it down to sometime during the two weeks prior to the start of the school year.

where other people were sitting, but Ms. Cacioppo wanted to sit on the other side of the building where no one else was sitting.  Ms. Cacioppo sat so close to Plaintiff that they were touching. They began discussing Plaintiff's ongoing divorce, and Ms. Cacioppo told Plaintiff that she had also been through a divorce and could help her.  At some point in the conversation, Ms. Cacioppo began licking her ice cream cone seductively and saying something along the lines of "this is the way I can do you."  Ms. Cacioppo was also using her tongue to lick the alphabet into her ice cream cone, apparently so vigorously as to knock the ice cream onto the ground.  Ms. Cacioppo proceeded to pick the ice cream up off of the ground, wipe it off, and continue to lick it seductively.  Plaintiff cannot recall exactly what was said, but she remembers Ms. Cacioppo's saying something about her being able to help the Plaintiff sexually.  After this event, the parties returned to Glover, and Plaintiff did not reveal this incident to anyone immediately it occurred.

Plaintiff alleges that Ms. Cacioppo began harassing her over the next several weeks[5] by denigrating her work performance in e-mails to other people, telling them that Plaintiff could not do her work.  In her deposition, Plaintiff makes the argument that "every school year, we get . . . 30 hours that we can use to actually get [the] kindergartners enrolled and get the information in" and that Ms. Cacioppo "would not let [her] use those 30 hours" and "kept denying them."  Pl. Dep. 2 at 23.[6]  While it is not at all clear what this means, it apparently amounts to an allegation that if Plaintiff's work was substandard it was a result of Ms. Cacioppo's own actions.

Plaintiff never filed an official complaint with the Akron School District concerning any alleged sexual harassment, nor did she ever tell Ms. Hooper.  Plaintiff says that the first person she informed was her general practitioner, Dr. Ann DiFrangia.  Plaintiff made frequent visits to

---

[5] Plaintiff and Defendants dispute the actual amount of time spent together after August 14, 2006, which was frequently punctuated by Plaintiff's absences.

[6] Plaintiff's deposition was interrupted and continued on a different date. The Court will distinguish between her first and second depositions by the identifiers "Pl. Dep. 1" and "Pl. Dep. 2."  The respective transcripts may be found on the docket at Docs. 60, 66.

Dr. DiFrangia during this time and contends that she discussed the harassment during a scheduled appointment.  Plaintiff estimates that at some point in September, she informed her attorney of the harassment.  She allegedly then told Dr. Connie Hathorn, the Executive Director of Human Resources for Akron Public Schools, though she cannot identify when that occurred. Plaintiff allegedly went to the Administrative Building and saw Dr. Hathorn walking outside to his car.  She stopped him and told him that she was being sexually harassed by Ms. Cacioppo but did not give any details.  According to Plaintiff, Dr. Hathorn was in a rush and told her that he would get back to her, but never did.  Plaintiff never pursued the matter further with Dr. Hathorn. Finally, Plaintiff contends that she told her union representative Kathie Smith in an email, but she did not include any details because she feared the information might be disseminated.  She could not produce the email she sent.  Plaintiff stated that Kathie Smith told her to request a transfer out of Glover, which she eventually did.

Although she did not file a harassment complaint in this instance, Plaintiff was familiar with the process of filing a sexual harassment complaint because she filed one when an unidentified male left a message on her husband's work phone claiming that the caller had engaged in sexual activity with Plaintiff.  She claimed that she recognized the caller's voice and gave a recording of the message to Ms. Hooper, who then called a meeting about the tape with an investigator for the Board. They listened to the tape and decided that they could not positively identify the caller based upon the recording, and then informed Plaintiff that she would have to pursue the claim on her own through the police department, which she never did.  She now contends that the Board's failure to act when she made a formal complaint caused her to believe that they would not act if she filed a sexual harassment complaint against Ms. Cacioppo.

4

Near the end of August and after the alleged incident at Strickland's, Plaintiff began missing a substantial amount of work.  There is no dispute that Plaintiff was not at work from September 1 to November 10, 2006.  The reasons for her absences are varied, but the following demonstrates, as reflected on her absence forms (which the parties refer to as S2Js), the dates on which she was absent as well as the stated reasons and the dates on which the absence forms were submitted.[7]

| Date(s) of absence | Stated reason for absence | Date S2J submitted |
|---|---|---|
| September 1[8] (1/2 day) | Brother in nursing home required her care | October 11 |
| September 5-8 | Ill and traveling inconvenience | September 22 |
| September 11 | Death in family; nephew | September 11 |
| September 12-15 | Serious illness | September 22 |
| September 18-22 | Seriously ill | October 11 |
| September 25-October 6 | Ill | October 11 |
| October 9-16 | Ill | October 11 |
| October 17-20 | Ill | October 18 |
| October 23-November 3 | Ill | October 18 |
| November 6 | Ill | October 18 |
| November 7-10 | Shingles and stomach flu | November 13 |

Defendants have not taken issue with Plaintiff's absence on September 1 or September 11, nor have they discussed the absences from September 12 to November 10, other than to note the untimeliness of the absence forms.  However, they do cite the September 5-8 absence, which occurred in connection to Plaintiff's trip to Jamaica.  It appears that Plaintiff flew with her daughter from Detroit to Jamaica and planned to return from her trip on September 5th, the Tuesday after Labor Day and a work day for which Plaintiff has provided no evidence that she was permitted to be absent.  On her return trip, she was delayed in Miami and did not fly out

---

[7] These absence forms may be found at Exhibit D to Pl. Dep. 1, Doc. 60 at 175-182, 203-205.
[8] All dates are in 2006.

5

until September 6. When she arrived in Detroit on September 6, she planned to drive to her daughter's home in Columbus before returning to Akron. On September 7th, Plaintiff's car broke down on the way to Columbus, and she claims that this caused her to miss work on September 8th as well.

During the deposition of Ms. Hooper, Plaintiff's counsel suggested that Plaintiff might have had a doctor's excuse for the trip to Jamaica and the absence that resulted on September 5.[9] Hooper Dep. at 68-73. He then produced a "Certificate to return to work" signed by Dr. DiFrangia stating that Plaintiff was under her care from September 4 to September 15, 2006, and that she would be able to return to work on September 18, 2006. Doc. 59-2 at 142. The certificate bears no indication of when Dr. DiFrangia issued it or when (or whether) Plaintiff submitted it to her superiors at the School Board.

Defendants produced the itinerary for Plaintiff's trip to Jamaica (which was given to them by Plaintiff) that shows that she had planned the trip and purchased her tickets on June 19, 2006. Doc. 60 at 197. Ms. Hooper testified during the course of her deposition that she had never seen the doctor's excuse which Plaintiff's counsel presented to her at the deposition, and that she was unaware of any medical treatment that would have required Plaintiff to be on a plane to or from Jamaica (on a trip planned several months in advance) without prior approval on a work day.

On September 5, when Plaintiff did not report for work, Ms. Cacioppo sought a backup secretary to perform the tasks required at Glover, including the recording of attendance from the first day of school. The responding secretary, Sharon Null, reported to Ms. Hooper upon arriving at Glover and assessing the situation: "It appears that no one has been enrolled in Delta

---

[9] Defendants have also not focused upon the absences on September 6-8, which allegedly resulted from derailed travel plans. Instead, the evidence and depositions reflect that they are focused upon the September 5 absence.

since I was here last Monday.[10]  Also, the attendance has not been entered thus far this school year . . . There are probably at least 30 enrollments."  Ms. Null requested assistance from another backup secretary.  Doc. 60 at 208.

Defendants also learned that, on August 9, 2006, Plaintiff pled guilty in Akron Municipal Court to possession of marijuana.  The municipal court suspended Plaintiff's license, imposed a fine, and required that she write an essay about the dangers of marijuana.  It is not clear when Defendants learned of the conviction, but at some point Plaintiff apparently informed them that she had satisfied the court's sentence before she had actually done so.  A bench warrant was issued for Plaintiff on August 26, 2009, for failure to complete the essay.  The court later changed the deadline for the essay to September 11, 2006, and Plaintiff submitted it timely, satisfying the sentence and causing the court to recall the bench warrant.  Defendants learned of the bench warrant prior to its recall from the head of security for the schools, who was an auxiliary police officer.  Although much confusion resulted from the recitation of these facts at Ms. Hooper's deposition, it is Ms. Hooper's contention that sometime between the issuance of the bench warrant and September 11, 2006, Plaintiff informed Ms. Hooper and Dr. Connie Hathorn, the president of the School Board, that she had satisfied the requirements of her sentence when in fact she had not.

On September 22, 2006, Ms. Hooper and Dr. Hathorn, as well as Plaintiff and two union representatives, attended a hearing noticed to Plaintiff and held pursuant to the United States Supreme Court's ruling in *Cleveland Board of Education v. Loudermill*, 470 U.S. 532 (1985).  At that point in time, although Plaintiff had not reported to work since September 1, the School Board had received no absence forms from Plaintiff other than the September 11 request to

---

[10] It appears that the date on which Ms. Null was previously at Glover was August 28, 2006, another date on which Plaintiff was absent from work.  *See* Doc. 60 at 206.

7

attend her nephew's funeral.  This issue was discussed at the hearing, as was Plaintiff's unapproved absence for the Jamaica trip and her misdemeanor conviction and related representations to Ms. Hooper and Dr. Hathorn.  Doc. 60 at 166.  These incidents were characterized as a violation of the attendance policy, insubordination by making false statements to administrators, and conduct unbecoming of an employee of the School Board with respect to the misdemeanor conviction.  Together with her union representatives, Plaintiff entered into a Last Chance Agreement in which she agreed to the following:

1.     That she would take one day of unpaid absence for September 8, 2006, in lieu of a one-day suspension without pay;

2.     That she would provide updated physician's statements to cover her absences starting September 18, 2006, all of which forms were to be sent directly to Ms. Hooper;

3.     That she would submit to random drug testing for one year;

4.     That she would participate in drug counseling at Tri-County EAP;

5.     That, pursuant to her bid for a post at Reidinger Middle School, she would be assigned to Reidinger when she returned to work.

*Id.* at 166-67.

Plaintiff received the September 26 letter summarizing the Loudermill hearing and outlining each infraction and each penalty imposed.  At no time did she challenge the outcome of the hearing or the accuracy of the letter, nor did she contend that the union representatives had misrepresented her.  Furthermore, at the time of the Loudermill hearing, Plaintiff never mentioned any of her allegations regarding Ms. Cacioppo's behavior at Strickland's, and she did not attempt to correct this omission when she received the summary of the hearing.  Plaintiff also did not tell those in attendance at the Loudermill hearing that the suspension of her driving privileges would affect her ability to attend the Tri-County EAP sessions and to appear for random drug tests, which ultimately was the case.

8

Defendants contend that they discussed with Plaintiff at the Loudermill hearing that she was not permitted to enter Glover Elementary, evidenced by the requirement that she turn in her absence forms directly to Ms. Hooper (apparently instead of submitting them to her Ms. Cacioppo, her then principal, at Glover).  However, there is no documentation that supports this prohibition and Plaintiff denies it.

On October 13, 2006, Plaintiff came to Glover, purportedly to participate in a meeting of the PTA, of which she was the treasurer.  When she entered the office, Ms. Cacioppo saw her there and confronted her.  Accounts of what happened next differ dramatically.  According to Plaintiff, Ms. Cacioppo took her into her office and began berating her, blocking the door and refusing to allow her to leave.  Plaintiff also contends that Ms. Cacioppo threatened her with undisclosed consequences if she continued to pursue the sexual harassment allegations.  Ms. Cacioppo states that she confronted Plaintiff and ordered her to leave the school, which Plaintiff refused to do, choosing instead to bolt to a different part of the office and then into the school building.  Either version involved yelling and apparently occurred in front of school staff and parents who were in the office.

Apparently, Ms. Cacioppo contacted building security and waited downstairs at the exit for Plaintiff to leave the building.  The official account of the story, which was written by the responding security officer, recounted that Ms. Cacioppo demanded that Plaintiff's car be towed because Plaintiff's license was still suspended, and that she further took Plaintiff to task for driving to school at all under the circumstances.  The security officer confirmed that Plaintiff's license was suspended.  Plaintiff at some point called Ms. Cacioppo a "simple ass" and insisted that her aunt—who was strangely absent from the melee—had driven her to the school and then had left the premises on foot, leaving Plaintiff's car parked illegally in the parking lot.  At some

point, this same aunt drove up in another aunt's jeep (in which the second aunt was not present) and the security officer arranged to have Plaintiff's car towed.  In her deposition, Ms Cacioppo denied having told the security officer that Plaintiff's license was suspended, and instead claimed that she had insisted upon Plaintiff's removal from Glover because she had been ordered during the Loudermill hearing not to return to Glover.

When Plaintiff was reassigned to Reidinger, Ms. Hooper informed her that before she could return to work from sick leave she needed to pass a drug test, as agreed to by Plaintiff during the Loudermill hearing.  Because Plaintiff was determining when she would return to work, she apparently was permitted to choose the date of her first drug test.  She chose November 10, 2006.  On November 13, 2006, Plaintiff missed a scheduled drug counseling session at Tri-County EAP, but reported for work for the first time at Reidinger.  Ms. Hooper received a call on November 16, 2006, from Community Health Center with the results of Plaintiff's drug test.  Plaintiff tested positive for opiates and marijuana.  Ms. Hooper sent Plaintiff a letter on November 20, 2006, informing her that a second Loudermill hearing would take place on November 30, at which the events that had occurred since the last Loudermill hearing would be discussed, including the drug test and related substance abuse, insubordination, and contract violations.  Plaintiff did not attend the November 30 meeting, but her union representatives were present.  The School Board accepted a recommendation at its December 12 meeting to terminate Plaintiff's employment effective December 13, 2006.  A Civil Service Discharge was mailed to Plaintiff by certified and regular mail when hand delivery was unsuccessful.  Plaintiff filed complaints with the Equal Employment Opportunities Commission

as well as the Ohio Civil Rights Commission.  The EEOC charge was ultimately dismissed, but the OCRC charge went forward.[11]

Just after Defendants filed their Motion for Summary Judgment (Doc. 59), Plaintiff filed a motion for partial summary judgment (Doc. 61).  The Court ordered Plaintiff's motion stricken as being filed outside the deadline for a dispositive motion (Doc. 69).  Plaintiff then filed a motion for leave to file her motion for summary judgment (Doc. 72) as well as a Motion to Supplement (Doc. 71) her Response in Opposition to Defendants' Motion for Summary Judgment.  The Motion to Supplement was a result of Defendants' argument that, because Plaintiff's motion for partial summary judgment had been stricken, any arguments or factual recitations set forth therein had also effectively been stricken from the record and could not be incorporated by reference into Plaintiff's Response in Opposition to Defendants' Motion for Summary Judgment, which Plaintiff had attempted to do.  *See* Def. Reply Brief, Doc. 70 at 2.  As an initial matter, the Court GRANTS Plaintiff's Motion to Supplement inasmuch as it has considered the arguments set forth in Plaintiff's Response (Doc. 67) in Opposition to Defendants' Motion for Summary Judgment.

## II.    Applicable legal standard

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(c). The court is to determine "whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 250 (1986).  The court views the evidence of record and draws all reasonable inferences in the

---

[11] It is not clear from the record how the OCRC complaint was resolved.

11

light most favorable to the nonmoving party.  *LaPointe v. United Autoworkers Local 600*, 8 F.3d 376, 378 (6th Cir. 1993).

Summary judgment is appropriate if the party that bears the burden of proof at trial does not establish an essential element of its case.  *Tolton v. Am. Biodyne, Inc*., 48 F.3d 937, 941 (6th Cir. 1995) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).  "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."  *Anderson*, 477 U.S. at 247-48 (Emphasis in original).  A fact is "material" only if its resolution will affect the outcome of the lawsuit.  *Id.* at 248.  Summary judgment should be denied if "a reasonable jury could return a verdict for the nonmoving party."  *Id*.

## III.  Analysis

As set forth above, Plaintiff has raised four claims.  The Court will address them in a different order than that in which they were presented in the Amended Complaint.

### 1.  FMLA

Plaintiff alleges that Ms. Hooper, in her official capacity, interfered with her rights under the Family and Medical Leave Act, 29 U.S.C. § 2601, *et seq.*, (FMLA)., by violating her right "to maintain Job [sic] security for health conditions that prevented her from working for temporary periods of time."  Am. Compl. at 4.  Specifically, Plaintiff contends that "Ms. Hooper . . . authorized and Certified [sic] the Plaintiff's Medical Leave [sic] for specific days and then recommended the Plaintiff's termination to the Akron Board of Education based on being absence [sic] from work on the same days."  *Id.*

"The FMLA affords an eligible employee up to twelve weeks of leave within a twelve month period when the employee suffers from 'a serious health condition that makes the

employee unable to perform the functions of . . . [his] position,' among other qualifying reasons." *Brenneman v. Medcentral Health Sys.*, 366 F.3d 412, 420 (6th Cir. 2004), citing 29 U.S.C. § 2612(a)(1)(D).  "The term 'serious health condition' signifies 'an illness, injury, impairment, or physical or mental condition that involves . . . (A) inpatient care in a hospital, hospice, or residential medical care facility or (B) continuing treatment by a health care provider." *Brenneman*, 366 F.3d at 420-21, citing 29 U.S.C. § 2611(11).  *See also* 29 C.F.R. § 825.114 (defining "inpatient care in a hospital, hospice, or residential medical care facility" and "continuing treatment by a health care provider"). "29 C.F.R. § 825.114(a)(2)(iii) provides that a 'serious health condition involving continuing treatment by a health care provider includes . . . any period of incapacity or treatment for such incapacity due to a chronic serious health condition.'" *Brenneman*, 366 F.3d at 421.

"It is unlawful 'for any employer to interfere with, restrain, or deny the exercise of or attempt to exercise, any right provided under [the FMLA].'" *Walton v. Ford Motor Co.*, 424 F.3d 481, 485 (6th Cir. 2005), quoting 29 U.S.C. § 2615(a)(1).  "Employers who violate § 2615 are 'liable to any eligible employee affected' for damages and appropriate equitable relief." *Walton*, 424 F.3d at 485, citing 29 U.S.C. § 2617(a)(1).

An employee who claims employer interference with his rights under the FMLA must prove that "(1) he is an 'eligible employee,' 29 U.S.C. § 2611(2); (2) the defendant is an 'employer,' 29 U.S.C. § 2611(4); (3) the employee was entitled to leave under the FMLA, 29 U.S.C. § 2612(a)(1); (4) the employee gave the employer notice of his intention to take leave, 29 U.S.C. § 2612(e)(1); and (5) the employer denied the employee FMLA benefits to which he was entitled." *Cavin v. Honda of Am. Mfg. Inc.*, 346 F.3d 713, 719 (6th Cir. 2003); *see also Walton*, 424 F.3d at 485.

13

In order for an employee to take advantage of FMLA leave for a foreseeable absence, he must provide the employer with written notice in advance of that absence. 29 U.S.C. § 2612(e)(2). When the leave required by the employee is unforeseeable, the regulations under the FMLA say that "an employee should give notice to the employer of the need for FMLA leave as soon as practicable under the facts and circumstances of the particular case." *Walton*, 424 F.3d at 485, citing 29 C.F.R. § 825.303(a). "While the employee need not actually mention the FMLA by name, 'the critical question is whether the information imparted to the employer is sufficient to reasonably apprise it of the employee's request to take time off for a serious health condition." *Brohm v. JH Props., Inc.*, 149 F.3d 517, 523 (6th Cir. 1998) (quoting *Manuel v. Westlake Polymers Corp.*, 66 F.3d 758, 762 (5th Cir. 1995); *see* 29 U.S.C. § 2612(e)(2) (requiring employees to give 30 days' notice for foreseeable treatment of a serious health condition).

There is no evidence in the record of Plaintiff's health condition. There is no evidence of any doctor's excuse other than that presented with respect to the September 5, 2006, absence and related trip to Jamaica (which, as noted above, bears no date and no explanation of the absence), though some of the absence forms refer to doctor's excuses that are not contained in the record. There is no evidence that Plaintiff gave advance warning of those absences requiring FMLA leave during the month of September. All of Plaintiff's medical leave forms for September and early October were submitted well after the absences for which they were submitted. It was not until mid-October that Plaintiff submitted leave forms during or even slightly before her leave periods. However, there is also no evidence that Plaintiff suffered from sudden or unexpected illnesses. It is notable, then, that Plaintiff apparently made little effort to submit her absence

forms timely, as required under the FMLA and her Last Chance Agreement, as well as by School Board policy.[12]

Not only is there a paucity of information in the record regarding Plaintiff's condition and actions regarding FMLA leave, there is also no evidence that Plaintiff was denied the benefits required under the FMLA.  She claims that she was denied a paycheck on October 13, but, as Kathy Hooper indicated, Plaintiff had not submitted all of her absence forms and doctor's excuse that were required in order to provide FMLA leave, which she had agreed at the Loudermill hearing to submit.  Without those forms, the School Board was unsure how to pay Plaintiff and whether her absences were excused or unexcused.  Hooper Dep. at 89-90.  Plaintiff has not claimed that she was ultimately denied her paycheck.  It appears from the record that, once she submitted her absence forms, she received her paycheck.

With respect to an employee's responsibility to give notice of a need for FMLA leave, the Code of Federal Regulations provides as follows:

> When the approximate timing of the need for leave is not foreseeable, an employee should give notice to the employer of the need for FMLA leave as soon as practicable under the facts and circumstances of the particular case. It is expected that an employee will give notice to the employer within no more than one or two working days of learning of the need for leave, except in extraordinary circumstances where such notice is not feasible. In the case of a medical emergency requiring leave because of an employee's own serious health condition or to care for a family member with a serious health condition, written advance notice pursuant to an employer's internal rules and procedures may not be required when FMLA leave is involved.

29 C.F.R. § 825.303(a).

In *Brenneman*, 366 F.3d at 423, the Sixth Circuit held that a plaintiff with an extensive absence record who had taken leave one day and did not report to his employer that it was

---

[12] Plaintiff has argued that she attempted to submit these forms timely but that Ms. Hooper claimed not to have them.  There is no evidence in the record that this was the case, nor did she make any such representations at the Loudermill hearing or in its aftermath.  Instead, she filled out at the hearing those absence forms missing at the time of the hearing.

15

FMLA leave either of the next two days could not then claim that he had sought and been denied FMLA leave.  The plaintiff had missed a day of work due to a complication with his diabetes, but he did not inform the employer until several days later that he was taking FMLA leave for the missed day.  *Id.*  According to the employer's policy, the plaintiff was ultimately terminated because this absence was the third attendance-related issue in five years.  *Id.*  Citing the regulatory provision that requires that an employee inform the employer regarding FMLA leave "within one or two working days of learning of the need for leave," 29 C.F.R. § 825.303(a), the court concluded that the plaintiff had not provided proper notice to his employer "within the necessary time frame for unforeseeable leave" because he had not informed the employer until the sixth day after his absence that the leave was FMLA-related.  *Id.* at 424.

The portions of the Amended Complaint quoted above are the only ones relating to Plaintiff's FMLA claim.  No further details are provided regarding this claim, and the Court finds that Plaintiff has not demonstrated that Ms. Hooper interfered with her FMLA rights.  For weeks, Plaintiff took leave that she apparently believed was FMLA-qualified leave.  Defendants did not deny that leave, but simply required the *timely* submission of absence forms, which courts have repeatedly found to be an enforceable requirement.  *See Brenneman*, 366 F.3d at 423; *Walton*, 424 F.3d at 486; *Cavin*, 346 F.3d at 722.  This record shows that Defendants were receiving notice of Plaintiff's absences as many as three weeks after Plaintiff was absent.  Despite the fact that Plaintiff entered into a Last Chance Agreement that specified that she would submit absence forms timely to Ms. Hooper, she did not do so.

At no time did Defendants deny Plaintiff FMLA leave.  Instead, Plaintiff received compensation for those days for which she submitted absence forms, even when she submitted them late.  Furthermore, though the termination letter indicates "excessive absenteeism or

16

tardiness," this is then explained as a failure to "file absence forms in a timely manner," which was in direct contravention of her Last Chance Agreement.  Doc. 60 at 171.  The Court finds Plaintiff's FMLA claim to be without merit.

       **2.**       **Fourth Amendment**

Plaintiff next alleges that Ms. Hooper, in her official and individual capacities, violated her Fourth Amendment rights in requiring that she submit to drug testing as part of her Last Chance Agreement.  Defendants contend that Ms. Hooper is entitled to qualified immunity in her individual capacity, and that Plaintiff's claim against Ms. Hooper in her official capacity lacks merit.

The Fourth Amendment provides, in pertinent part, that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . but upon probable cause."  U.S. Const., amend IV.  "In assessing whether the right against unreasonable searches and seizures has been violated, the court must consider whether the action is 'attributable to the government,' and amounts to a 'search' or 'seizure' for Fourth Amendment purposes."  *Relford v. Lexington-Fayette Urban County Gov't*, 390 F.3d 452, 457 (6th Cir. 2004) (citing *Skinner v. Ry. Labor Executives' Ass'n*, 489 U.S. 602, 614 (1989).

Clearly the drug test in this matter is attributable to the government, as it was conducted at the behest of the School Board.  Furthermore, "it is well settled that drug tests, which utilize blood-testing, breath-testing or urinalysis, constitute 'searches' that come within the ambit of the Fourth Amendment."  *Relford*, 390 F.3d at 457 (citing *Skinner*, 489 U.S. at 616-17).  Therefore, because the test at issue in this matter consisted of urinalysis, it clearly falls within the category of a search.  However, the analysis does not end here, and the Court must next consider whether

the test was reasonable under the circumstances, which is a fact-intensive analysis that "depends on all of the circumstances surrounding the search or seizure and the nature of the search or seizure itself." *See Relford*, 390 F.3d at 458 (quoting *United States v. Montoya de Hernandez*, 473 U.S. 531, 537 (1985)).

During Plaintiff's deposition, counsel for Defendants reviewed the Loudermill hearing of September 22, 2006, with Plaintiff. Pl. Dep. 1 at 74. Counsel asked, "You said that you will submit to a random drug test. Is that true[?]" *Id.* at 84. Plaintiff responded, "Yes." *Id.* Counsel reiterated, "[Y]ou agreed to submit to a random drug test?" *Id.* Plaintiff responded, "Yes." *Id.* He later asked, "Again, you agreed to submit to drug testing for one year?" *Id.* Plaintiff responded, "Yes." *Id.* Defense counsel also asked Plaintiff whether she remembered that two union representatives were present on her behalf at the Loudermill hearing, which Plaintiff recalled. *Id.* at 74-75.

Defense counsel also confirmed with Plaintiff that the Loudermill hearing letter stated that "[f]ailure to adhere to the above conditions could result in further disciplinary action to include, but not limited to, suspension without pay or termination." *Id.* at 84. Plaintiff acknowledged the language of the letter, and also the instruction that "[i]f you do not agree with the statements made in this conference summary letter, please reply with your written concerns by Tuesday, October 3, 2006." *Id.* at 84-85. She acknowledged that she had not expressed any concerns. *Id.* at 85.

The Court finds that, by Plaintiff's own admission, she entered into the Last Chance Agreement willingly and voluntarily. She agreed to undergo drug tests, which were reasonable given Plaintiff's prior conviction for drug possession, and her position in a school interacting with students and parents. The School Board's policy regarding substance abuse clearly states

18

that employees cannot report to work when under the influence of alcohol or other drugs.  Doc. 60 at 184.  The only means of verifying that an employee is not under the influence is through the use of a drug test, an implied enforcement mechanism within the substance abuse policy. Furthermore, because Plaintiff voluntarily agreed to the Last Chance Agreement, she had fair warning that in preparation for returning to the school, she would be required to undergo a drug test.  *Id.* at 84.  Plaintiff determined that she was ready to return, she took a drug test, and she failed.  The Court finds that Plaintiff's claims that the School Board, and specifically Ms. Hooper, violated the Fourth Amendment are without merit.  Summary judgment is granted for Defendants on this claim.  Because the Court has concluded that no constitutional violation occurred, no discussion of Ms. Hooper's qualified immunity is required.  *Saucier v. Katz*, 533 U.S. 194 (2001).[13]

### 3.    Quid pro quo sexual harassment

Plaintiff next alleges that she was sexually harassed by Ms. Cacioppo during the incident at Strickland's, and that this was a cause of her termination.  The facts as alleged by Plaintiff are set forth above in the Court's statement of the facts.  In particular, Plaintiff alleges in her Amended Complaint (Doc. 24) that "[o]n or about August 24, 2006, and continuing up until December 12, 2006, Defendant Rebecca Cacioppo . . . subjected the plaintiff . . . to Quid pro quo [sic] sexual harassment and to a sexually offensive, intimidating and hostile work environment." Am. Compl. at 2.  Plaintiff goes on to allege that, when she refused to consent to Ms. Cacioppo's advances, Ms. Cacioppo "repeatedly denigrated her work performance, harassed and beleaguered her, and such actions ultimately lead [sic] to and was [sic] the proximate cause of [Plaintiff's]

---

[13] The Court notes that the *Saucier* decision was overturned by the Supreme Court's decision in *Pearson v. Callahan*, 129 S. Ct. 808 (Jan. 21, 2009).  However, as the *Pearson* decision did not do away with the two-step analysis of *Saucier*, and simply permitted the courts to conduct the analysis in any order, *Pearson* does not apply in this context.  *See, e.g., Streater v. Cox*, No. 08-1631, 2009 WL 1391533, at *4 (6th Cir. May 15, 2009).

being discharged from her employment of 13 years." *Id.*  As part of her allegations, Plaintiff claims that Ms. Hooper aided Ms. Cacioppo in subjecting Plaintiff to the harassment that ultimately led to Plaintiff's termination.  *Id.*

Plaintiff further contends that she had tried to file a sexual harassment grievance with the Board regarding a separate incident of harassment, but the Board declined to pursue the charge. Moreover, Plaintiff alleges, she told Dr. Hathorn about this harassment, thereby informing the School Board, and the Board still "failed to take any steps to prevent the plaintiff, [sic] from being subjected to Quid pro quo [sic] harassment or from being subjected to a sexually offensive, intimidating and hostile work environment." *Id.* These facts caused Plaintiff to conclude that nothing would ever be done in her case, and causes her now to allege that the School Board "uses grievances [sic] procedures that are a mere pretext for responding to EEOC complaints[.]"

The Sixth Circuit has defined quid pro quo sexual harassment as harassment that is "anchored in an employer's sexually discriminatory behavior which compels an employee to elect between acceding to sexual demands and forfeiting job benefits, continued employment or promotion, or otherwise suffering tangible job detriments." *Highlander v. K.F.C. Nat'l Mgmt. Co.*, 805 F.2d 644, 648 (1986) (citing *Henson v. City of Dundee*, 682 F.2d 897, 909 (11th Cir. 1982).  In order to prevail on a claim of quid pro quo sexual harassment, a plaintiff bears the burden of demonstrating the following:  (1) that she is a member of a protected class; (2) that she was subjected to unwelcome sexual harassment in the form of sexual advances or requests for sexual favors; (3) that the harassment was based on sex; (4) that the employee's submission to unwelcome advances was an express or implied condition of receiving job benefits or that employee's refusal to submit to supervisor's sexual demands resulted in a tangible job detriment; and (5) that there exists respondeat superior liability. *Id*. at 648.

20

Clearly, Plaintiff is a member of a protected class. While Ms. Cacioppo entirely rejects Plaintiff's version of the facts regarding the trip to Strickland's, the standard for consideration of a motion for summary judgment requires that the Court view the facts in the light most favorable to Plaintiff. *LaPointe*, 8 F.3d at 378. Even assuming that Plaintiff has established that harassment occurred based upon her sex, the Court finds that Plaintiff has in no way demonstrated that her rejection of Ms. Cacioppo's alleged advances caused her termination.

The harassment allegedly occurred sometime in the last two weeks of August 2006. Pl. Dep. 2 at 58. Plaintiff cannot affix even an approximate date to the harassment, though she has speculated that it occurred sometime between August 14 and August 28. *Id.* at 59. On November 10, 2006, Plaintiff failed a drug test that she was required to pass in order to return to her job at a different school from the one at which Ms. Cacioppo worked. Plaintiff has done nothing to establish causation between the alleged harassment, which the Court must assume occurred as Plaintiff alleges, and Plaintiff's termination. In fact, Plaintiff's failure of the drug test was sufficient cause for the School Board to dismiss her, given both the substance abuse policy (Doc. 60 at 184) and the agreement reached at the September 22 Loudermill Hearing. Moreover, Plaintiff apparently repeatedly failed to comply with the requirement she agreed to at the Loudermill hearing that she would submit her absence forms timely.

There is absolutely no evidence of a connection between the alleged harassment and Plaintiff's termination. Instead, Defendants' decision to discharge Plaintiff resulted from Plaintiff's failed drug test. Furthermore, any claims that the School Board failed to stop the harassment are without merit, as Plaintiff herself indicates that no further quid pro quo harassment occurred after the Strickland's event. The Court finds that Plaintiff has failed to

21

make out a prima facie case of quid pro quo sexual harassment because she has failed to allege causation.  Summary judgment is granted to Defendants on this claim.

### 4. Hostile work environment

Plaintiff's final claim is that Ms. Cacioppo created a hostile work environment for Plaintiff by subjecting her to a "sexually offensive, intimidating and hostile work environment" in which Ms. Cacioppo "repeatedly denigrated her work performance, harassed and beleaguered her."  Am. Compl. at 2.  Plaintiff alleges that Ms. Hooper aided Ms. Cacioppo in her actions, and that the School Board failed to do anything to prevent it.

A hostile work environment occurs when the workplace is permeated with discriminatory intimidation, ridicule, and insult that are sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.  *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993).  A plaintiff must demonstrate that:

> (1) the employee was a member of a protected class; (2) the employee was subjected to unwelcomed sexual harassment in the form of sexual advances, requests for sexual favors, or other verbal or physical conduct of a sexual nature; (3) the harassment complained of was based upon sex; (4) the charged sexual harassment had the effect of unreasonably interfering with the plaintiff's work performance and creating an intimidating, hostile, or offensive working environment that affected seriously the psychological well-being of the plaintiff; and (5) the existence of respondeat superior liability.

*Highlander*, 805 F.2d at 649.

The analysis includes both an objective and a subjective component:  The conduct complained of must be both severe and pervasive enough to create an environment that a reasonable person would find hostile or abusive, and the plaintiff must subjectively regard that environment as abusive.  *Bowman v. Shawnee State Univ.*, 220 F.3d 456, 463 (6th Cir. 2000).  In determining whether the alleged harassment is sufficiently severe or pervasive to constitute a hostile work environment, the court must consider the totality of the circumstances. *Williams v.*

22

*Gen. Motors Corp.*, 187 F.3d 553, 562 (6th Cir. 1999).  Appropriate factors for a court to consider include the frequency of the alleged discriminatory conduct, its severity, whether the conduct is physically threatening or humiliating or merely an offensive utterance, and whether it unreasonably interferes with an employee's work performance.  *Bowman*, 220 F.3d at 463.  The conduct must be sufficiently extreme to amount to a change in the terms and conditions of employment.  *Harris*, 510 U.S. at 21 (quoting *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986).  "[M]ere utterance of an . . . epithet which engenders offensive feelings in a employee, does not sufficiently affect the conditions of employment to implicate Title VII." *Harris*, 510 U.S. at 21 (1993) (quoting *Meritor Savings Bank*, 477 U.S. at 67).

Plaintiff's claims in this regard must fail.  Plaintiff stated repeatedly in her deposition that she could not identify instances of hostility within the workplace other than emails that she supposed Ms. Cacioppo had written to others about Plaintiff's work performance.  *See* Pl. Dep. 2 at 22.[14]  She makes an unsubstantiated allegation in response to counsel's questions about what emails she had seen regarding her poor performing, stating, "There was almost a complaint every day about what I wasn't doing."  Pl. Dep. 2 at 25.  Plaintiff allegedly encountered Ms. Cacioppo one other time between the beginning of September 2006 and mid-November 2006, when she was terminated.  This encounter occurred October 13, 2006, when Plaintiff arrived at Glover, purportedly to work with the PTA or to drop off money for her grandchildren.  But from September 5, 2006 to November 13, 2006, Plaintiff took medical leave under the FMLA.  She was not present at work.

The Court finds that Plaintiff has failed to demonstrate that she was subjected to severe or pervasive harassment such as to create a hostile work environment.  Plaintiff's claims are vague

---

[14] The Court believes that this is a reference to the September 5, 2006, email, in which the substitute secretary requested additional help to complete the work that Plaintiff had apparently not done. *See* Doc. 60 at 208.

23

and non-specific, and she can provide no concrete instances of harassment or intimidation.  It is not sufficient for Plaintiff simply to say that her work environment was uncomfortable or tense. The environment must be "sufficiently extreme to amount to a change in the terms and conditions of employment."  *Harris*, 510 U.S. at 21.  Plaintiff has not given the Court any reason to believe that there was f  requent interference with her ability to do her work, or that the atmosphere in the workplace was anything more than tense for a brief period of time while Plaintiff was at Glover.[15]  Summary judgment is granted for Defendants on this claim.

**IV.     Conclusion**

Defendant's Motion for Summary Judgment (Doc. 59) is GRANTED in its entirety. Given the Court's disposition of Defendants' Motion, Plaintiff's motion for leave (Doc. 72) to file a motion for summary judgment is DENIED AS MOOT.  Furthermore, as indicated above, Plaintiff's Motion to Supplement (Doc. 71) her Response in Opposition to the Motion for Summary Judgment is GRANTED.

IT IS SO ORDERED.

DATED:  June 26, 2009                         */s/ John R. Adams*
                                             Judge John R. Adams
                                             UNITED STATES DISTRICT COURT

---

[15]  The Court reluctantly notes that Plaintiff's deposition testimony is frequently internally inconsistent and seemingly intentionally vague.  The Court will not allow Plaintiff to create her own issues of fact through internal inconsistencies.  *See cf., Penny v. United Parcel Serv.*, 128 F.3d 408, 416 (6th Cir. 1997).